IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MONICA WATSON, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO.  05-2303 |
| | : | |
| v. | : | |
| | : | |
| METHACTON SCHOOL DISTRICT, et al.,: | | |
| | : | |
| Defendants. | : | |

**<u>MEMORANDUM</u>**

Giles, J.                                                                                    May 11, 2007


**I.     INTRODUCTION**

Alleging violations of her federal constitutional rights and 28 U.S.C. § 1983, Plaintiff

Monica Watson ("Plaintiff")  filed this action on May 16, 2005 against the Methacton School

District ("the District"), Barry Prager ("Prager"), Principal of Methacton High School ("the high

school"), James Van Horn ("Van Horn"), President of the Methacton school board and David C.

Evans ("Evans"), Superintendent of the Methacton school board, seeking damages, court costs

and attorney's fees.  On November 10, 2005, Defendants filed a third party action against minor

Robert Hudome ("Hudome"), who was driving the vehicle that struck Plaintiff's vehicle, as well

as Gregory Dargan ("Dargan"), his stepfather.

Plaintiff argues that Defendants engaged in state action violative of her due process right

of bodily integrity as guaranteed by the 14th Amendment by organizing a post-prom celebration

that was held on the high school's campus, encouraging students to stay up all night and

1

permitting attendees departing the Party at 6:00 a.m. to drive their own vehicles, thereby creating

an obvious danger of vehicular accidents.  The parties have engaged in discovery.  Before the

court is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56(c), which is

now ripe for decision based upon a full record.  For the reasons that follow, the motion for

summary judgment is granted.


## II.       FACTUAL BACKGROUND

Pursuant to Fed. R. Civ. P. 56(c), the alleged facts, viewed in the light most favorable to

the plaintiff, follow.  Plaintiff was injured in a head-on collision with Hudome on May 17, 2003

at approximately 8:15 a.m. on Ridge Pike in Lower Providence, Pennsylvania in Montgomery

County.  (Pl.'s Amend. Compl. ¶¶ 45, 47.)  While Hudome does not recall the collision itself, he

believes that it occurred after he fell asleep while operating his vehicle.  (Defs.' Mot. Summ. J.

¶¶ 76-77.)  At the time of the accident Hudome was a junior at the high school.

Hudome and a date, Allison Lord ("Lord"), attended their prom the evening of May 16,

2003, the night prior to the accident.  (Defs.' Mot. Summ. J. ¶¶ 42-43.)  After the prom ended,

Hudome and Lord went to the high school, which was the site of the Post-Prom Celebration ("the

Party"), where they stayed from approximately 11:15 p.m. until 6:15 a.m. the next morning.

(Pl.'s Amend. Compl. ¶ 9; Defs.' Mot. Summ. J. ¶¶ 44, 59.)

After leaving the Party the morning of May 17th, Hudome and Lord drove approximately

11 minutes to the International House of Pancakes restaurant ("IHOP") in Blue Bell,

Pennsylvania, 5.7 miles from the high school.  They remained at the IHOP for 45 to 60 minutes

and had breakfast with Hudome's friend Andrew and his date.  (Supp. Jt. Stip. ¶ 3.)  They left

IHOP between 7:30 and 7:45 a.m.  Hudome drove Lord to her home, a distance of approximately 9.2 miles.  (Supp. Jt. Stip. ¶ 4.)  However, before going to Lord's home, Hudome drove to Audubon, Pennsylvania to show Andrew where his date lived.  (Pl.'s Resp. to Defs' Mot. Summ. J. ¶ 67.)  Hudome was at Lord's home only briefly.  (Hudome Dep. p. 53 ln. 7.)  Thereafter, he proceeded to a nearby gas station to get gasoline.  (Hudome Dep. p. 53 ln. 10-25.)  This took approximately five minutes.  (Hudome Dep. p. 53-54 ln 8-3.)  When he left the gas station, he turned onto Ridge Pike to head home.  (Defs.' Mot. Summ. J. ¶ 72.)  Two to three minutes later he fell asleep and his vehicle crossed into Plaintiff's oncoming lane of traffic.  (Pl.'s Amend. Compl. ¶¶ 28-29; Hudome Dep. p. 54 ln. 19-20.)  The result was an accident and significant injuries to Plaintiff.  (Defs.' Mot. Summ. J. ¶¶ 72-73.)

The Party attended by Hudome and Lord was the product of the efforts by the Methacton Post-Prom Organization ("the Organization").  A group of parents and community members formed the Organization in 1999 for the purpose of organizing an annual alcohol and drug-free post-prom celebration.  (Defs.' Mot. Summ. J. ¶ 5.)  Before the 2003 Party, post-prom celebrations were held in 2000, 2001 and 2002 on the grounds of the high school.  (Prager Dep. p. 28 ln. 11-14.)

Membership in the Organization is open to parents in the District, as well as residents of Lower Providence and Worchester townships.  (Defs.' Mot. Summ. J. ¶ 9.)  The Organization received nonprofit tax filing status and promulgated bylaws in 2004, existing as a "volunteer committee" through 2003.  (Barbone Dep. p. 74 ln. 21.)  It is undisputed that the Organization existed as a separate entity from the District.  (Defs.' Mot. Summ. J. ¶ 6.)

The impetus for a post-prom celebration originated with the president of the high school

Home and School Association (HSA).  (Prager Dep. p. 23-24 ln. 24-23.)  The HSA is a separate entity over which Principal Prager has no control.  (Prager Dep. p. 25 ln. 3-6.)  When HSA representatives spoke with Prager about hosting a post-prom celebration at the high school, he told them that he was not responsible for such an event and that the parents would have to run it. (Prager Dep. p. 27 ln. 5-9.)

The Organization consisted of multiple committees, including a steering committee, which were formed to plan and run the post-prom events.  (Defs.' Mot. Summ. J. ¶ 11.)  There is no position on the steering committee reserved for a school district representative, and no such representative sat on the committee for the 2003 Party.  The Organization was responsible for the fund-raising necessary for the post-prom celebrations, including the 2003 Party.  (Defs.' Mot. Summ. J. Ex. D.)

During the 2002-2003 academic year, Prager was employed as the principal of the high school.  (Prager Dep. p. 8-9 ln. 23-4.)  His interaction with the Organization, with respect to the planning of the Party, was similar to that in previous years.  He met with Organization members between five and ten times in preparation for the 2003 Party.  (Pl.'s Resp. to Defs.' Mot. Summ. J. ¶ 33; see also Barbone Dep. p. 13 ln. 10-12.)  He met with Gene Goff and Marijane Barbone, the co-chairs of the steering committee that year.  (Barbone Dep. p. 16 ln. 9.)  Those meetings ranged from fifteen minutes to an hour in length.  (Barbone Dep. p. 16 ln. 15-16.)  When Organization members met with Prager, they presented their plans for his review.  (Barbone Dep. p. 12 ln. 17-22.)  Logistics, such as the use of certain facilities in the building, and activities planned were also discussed.  (Prager Dep. p. 30 ln. 20-24.)  The District did not control the daily activity in planning the Party, but the Organization did discuss the plans with Prager for his

4

support, if necessary.  (Prager Dep. p. 81 ln. 8-18; see also Barbone Dep. p. 12 ln. 3.)  Prager had authority to approve or disapprove of any aspect of the Party.  (Prager Dep. p. 81 ln. 22.)

Through these meetings, the Organization kept Prager apprised of the plans for the Party. The Party was not understood by school district officials or Organization members as a school District event or a school-sponsored event.  (Prager Dep. p. 80 ln. 2-13.)  Prager testified several times that, despite being held at the high school, the Party was not a District function, because the "event itself was not unlike any organization, parent organization that wanted to use the school building for meetings and things like that."  (Prager Dep. p 80 ln. 2-3; p. 81 ln. 14-18.)

Prager recalled that when planning began for the 2000 post-prom celebration, there were discussions about the time the event would end and extensive discussion about making sure the students, prior to being dismissed, were fed, that they were alert and ready to go home.  (Prager Dep. p. 37 ln. 8-11.)  He noted that Organization members specifically discussed ensuring as students departed the Party, that they were able to drive, that they got to their car safely and were on their way.  (Prager Dep. p. 38 ln. 12-23.)  From the beginning of planning stages for the 2000 post-prom celebration, Prager anticipated that teachers and parents would be present during the event as volunteers.  (Prager Dep. p. 31 ln. 10-13.)  Prager anticipated that district administrators would be present to show support for the program and for student safety.  (Prager Dep. p. 31-32 ln. 17-6.)

David Evans was the acting superintendent of the Methacton school board at the time of the 2003 Party.  (Evans Dep. p. 10 ln. 22-24.)  Evans himself knew little about the operation of the Party, as he delegated interaction with the Organization to Prager.  (Prager Dep. p. 99 ln. 4-8; Evans Dep. p. 21 ln. 7-15.)  Evans was not involved in "planning or day-to-day decision making"

with respect to the Party.  (Evans Dep. p. 20 ln. 22-24.)  He had no "direct knowledge [of] the nitty gritty" of the Party or the post-prom celebrations in previous years.  (Evans Dep. p. 20 ln. 16-17.)  Prager was to keep Superintendent Evans apprised of developments in the planning of the Party.  (Prager Dep. p. 99 ln. 22-24.)

Evans testified that periodically a member of the HSA would present information at either an HSA meeting or a school board meeting on how the Organization was going to use spaces within the high school.  (Evans Dep. p. 34-35 ln. 21-15.)  Such a presentation regarding the 2003 Party was made on May 1, 2003 for which Defendant Van Horn was present.  (Pl.'s Amend. Compl. ¶ 10-11.)

The Party was held from approximately 11:00 p.m. on May 16, 2003 until 6:00 a.m. May 17, 2003.  The Party was staffed by volunteers, which included Organization members, high school teachers and District administrators.  Prager and Evans both attended the Party for several hours.  (Prager Dep. p. 32 ln. 7-16.)  Only one administrator, the assistant principal, was present for the entire Party.  (Pl's Resp. to Defs.' Mot. Summ. J. ¶ 35.)

During the Party, school rules, including a prohibition on the consumption of alcohol or cigarette smoking, were applicable.  (Prager Dep. p. 79 ln. 10-21.)  An on-site school district official would have handled discipline regarding any alcohol consumption. (Defs.' Mot. Summ. J. Ex. I p. 6.)  The Organization created the "Methacton post prom party standard operating procedures for safety and security" which listed the "senior district official (i.e., Principal or Vice Principal)" as "in charge for all routine matters."  (Defs.' Mot. Summ. J. Ex. I p. 6.)  The procedures further state that

This authority may be delegated to other school officials or

> volunteers at the discretion of the senior school official.  This
> person will have the authority to make the final determination on
> all routine matters including interpretation of rules, and handling of
> school (non-criminal) offenses.

(Defs.' Mot. Summ. J. Ex. I p. 6.)  Prager was aware that the operating procedures contained this provision.

To attend the Party a student had to submit, in advance, a permission slip signed by a parent.  This slip presented two options: permission could be given for a child to attend the Party and stay all night (until 6:00 a.m.) or permission could be given for a child to attend the Party and leave before 6:00 a.m., upon parent notification.  (Defs.' Mot. Summ. J. Ex. F.)  Hudome's mother signed a permission slip allowing him to stay at the Party all night.  (Hudome Dep. p. 14 ln. 12.)  An attendee could leave the Party before it ended with parental permission/notice.  (Defs.' Mot. Summ. J. ¶ 19.)  When Hudome arrived at the Party, his intention, consistent with parental permission, was to stay at the Party all night.  He also intended, upon leaving, to take his date, Lord, home and then go home.  (Hudome Dep. p. 24 ln. 15-24.)  Hudome understood that if he wished to leave before 6:00 a.m., his parents would be contacted for permission.  (Hudome Dep. p. 95 ln. 11-16.)

Throughout the evening and early morning, a variety of activities and events took place in the high school, including the screening of movies.  (Defs.' Mot. Summ. J. Ex. E p. 1.)  Party volunteers and organizers, as well as attendees, understood that attendees could be up all night.  (Prager Dep. p. 73 ln. 2-7.)  A classroom was designated as the "Sleeping Room" and attendees were free to use that room to rest or sleep.  The Sleeping Room was the same size as it had been in prior years.  (Defs.' Mot. Summ. J. ¶ 52.)  Other spaces were available for attendees to sleep,

including the movie theater.  (Defs.' Mot. Summ. J. ¶ 53.)

Between 4:00 and 4:30 a.m., Hudome and his date went to the Sleeping Room, but it was crowded.  (Defs.' Mot. Summ. J. ¶ 49.)  They did not ask a volunteer about an alternative place to sleep.  Instead, they elected to lie down on a sleeping bag in the hallway.  (Defs.' Mot. Summ. J. ¶ 50.)  Hudome testified that

> We tried to go into the sleeping room at one point, and it was crowded; there was no place to really sleep.  So we tried to lay down in the hallways.  But I didn't feel very tired and it wasn't very comfortable and the prizes were being given out in, like, a half-hour, so I went into the cafeteria while [Lord] laid down for a little bit...I didn't feel like I needed sleep. . . . I laid down and I was just kind of looking around. . . . I couldn't close my eyes and fall asleep.

(Hudome Dep. p. 30-31 ln. 4-4.)

Beginning at 5:00 a.m., prizes were handed out to attendees.  (Hudome Dep. p. 27 ln. 5.)  An individual had to be present at the ceremony in order to be eligible to receive a prize.  (Hudome Dep. p. 28 ln. 4.)  Breakfast was available in the cafeteria during and following the prize giveaway.  (Hudome Dep. p. 107 ln. 17-19.)

At 6:00 a.m., volunteers discharged the remaining Party attendees pursuant to parental permission.  Attendees had to check out and collect their personal belongings from Party volunteers in the gym.  (Barbone Dep. p. 55 ln. 14-18.)  Attendees exited in a single file, and were observed by volunteers, in part, for fatigue.  (Worman Dep. p. 28 ln. 14; Barbone Dep. p. 56 ln. 1-16; see also Defs.' Mot. Summ. J. ¶ 89.)  No one specifically asked Hudome how he felt before he left, but if they had, his response would have been that he felt "fine."  (Hudome Dep. p. 37 ln. 3-9.)  Party supervisors and volunteers instructed the attendees to go home and sleep.

8

(Pl.'s Resp. to Defs.' Mot. Summ. J. ¶ 90.)  However, attendees were not specifically warned about the dangers of "drowsy driving."  (Prager Dep. p. 69 ln. 16.)

Contrary to his original intentions and the Party instructions, Hudome did not proceed directly home from the Party.  Rather, he and Lord went for breakfast to the IHOP in Blue Bell with two friends.  Hudome did not feel tired while driving to IHOP or while having breakfast.  (Hudome Dep. p. 44 ln. 3, 25.)  He testified that even after dropping off Lord, he "may have been getting a little tired, but I still felt okay to drive."  (Pl's Resp. to Defs. Mot. Summ. J. ¶ 82.)  He felt "fine" while at the gas station.  (Hudome Dep. p. 54 ln. 9.)

Hudome drove approximately 19.3 miles after leaving the high school before the accident, which is approximately 49 minutes of driving time.[1]  (Supp. Jt. Stip. ¶ 7.)  Hudome's home is located 3.24 miles from the high school, approximately eight minutes driving time.  (Supp. Jt. Stip. ¶ 8.)  His date's home is 4.1 miles from the high school, approximately eleven minutes driving time.  (Supp. Jt. Stip. ¶ 10.)  Hudome lives approximately 2.2 miles from Lord, or eight minutes driving time.  (Supp. Jt. Stip. ¶ 11.)

III.    **DISCUSSION**

A.    **Standard of Review**

Rule 56(c) of the Federal Rules of Civil Procedure permits the entry of summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file,

---

[1] The evidence suggests that Hudome may actually have driven further, as the Joint Stipulation presents no time or mileage calculation for the leg of Hudome's trip that took him to Audubon "on the way" to Lord's home.

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The moving party bears the burden of proving that no genuine issue of material fact is in dispute.  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585 n. 10 (1986).  A factual dispute is "material" only if it might "affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  There is only a "genuine" issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  The court must examine the facts in a light favorable to the non-movant.  Id. at 255.  Furthermore, the court must resolve "all inferences, doubts and issues of credibility against the moving party."  Smith v. Pittsburgh Gage & Supply Co., 464 F.2d 870, 874 (3d Cir. 1972) (citations omitted).

The Supreme Court has further explained that "the burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 547 U.S. 317, 325 (1986).  The nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Id. at 324 (internal quotations and citations omitted).

**B.    State Actor**

Plaintiff brings this action under 42 U.S.C. § 1983 (2003), the relevant language of which states:

Every person who, under color or any statute, ordinance,

> regulation, custom or usage of any State of Territory or the District
> of Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress.

The threshold requirement of a claim brought under § 1983 is that "the alleged [constitutional]
deprivation was committed by a person acting under color of state law." Mark v. Borough of
Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)(quoting Moore v. Tartler, 986 F.2d 682, 685 (3d Cir.
1995)), cert denied, 516 U.S. 858 (1995).  In cases brought under § 1983, "'under color of law'
has consistently been treated as the same thing as the 'state action' required under the Fourteenth
Amendment." United States v. Price, 383 U.S. 787, 794 n. 7 (1966).  Section 1983 does not
create a new substantive right; rather, it provides for the recognition of a violation of an existing
constitutional right.  See Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).

Defendants' motion for summary judgment is based on their contention that the Party
attended by Hudome in May 2003 was organized and run by a private entity, the Organization,
and not the defendants.  Defendants argue that Plaintiff cannot establish state action, the
threshold of a claim brought under § 1983.  For the reasons that follow, the court agrees that
there was no state action.

Plaintiff argues that Defendants themselves

> violated her constitutionally protected liberty interest in her
> personal bodily integrity by the adoption of a policy that
> encouraged minors of tender years to forego sleep for over a
> twenty-four hour period, to remain extremely active during this
> time and to then operate motor vehicles in a sleep-deprived state,
> all of this with deliberate disregard for other motorists in the
> immediate vicinity.

11

(Pl.'s Mem. Supp. Resp. in Opp. To Defs.' Mot. Summ. J. p. 8-9.)

The Third Circuit has articulated three tests be followed in determining whether there has been state action: 1) exclusive province of the state; 2) state compulsion; and 3) joint participation.  See  Mark, 51 F.3d at 1142; see also Graham v. City of Philadelphia, No. Civ.A. 01-2593, 2002 WL 1608230, at *4 (E.D. Pa. July 17, 2002).

### 1. *Exclusive province of the state*

The first test asks whether "the private entity has exercised powers that are traditionally the exclusive prerogative of the state."  Mark, 51 F.3d at 1142 (quoting Blum v. Yaretsky, 457 U.S. 991, 1004-05 (1982)).  This standard has been increasingly difficult to meet as the Supreme Court has emphasized the "exclusivity" requirement, rarely finding it met.  Mark, 51 F.3d at 1142.

The Supreme Court, in Jackson v. Metro. Edison Co., 419 U.S. 345 (1974), determined that a private utility company, despite being regulated by the state and having a partial monopoly on the provision of utilities in some geographic areas, was not a state actor.  This conclusion rested in part on the fact that Pennsylvania, the state in which the utility conducted business, "rejected the contention that the furnishing of utility services is either a state function or a municipal duty."  Id. at 353.

Exclusivity of state function has been difficult to establish even when the alleged action is related to children and schools.  In Rendell-Baker v. Kohn, 457 U.S. 830 (1982), the Court found that an alternative school for students with drug, alcohol or emotional problems did not provide a function that was understood as within the exclusive province of the state, despite the state's

12

allocation of funding to this privately-run school.  Id. at 842.  "That a private entity performs a function which serves the public does not make it state action."  Id.  Similarly, the Third Circuit found in Black by Black v. Indiana Area Sch. Dist., 985 F.2d 707 (3d Cir. 1993), that a private bus company and its employees who provided transportation for students to and from public school, through a state contract, did not perform a function that was traditionally the exclusive prerogative of the state.  Id. at 710-11.

In this case, there is no evidence that suggests that activities of the Organization, specifically the planning and execution of an annual post-prom party, have traditionally been the exclusive functions of the state.  Members of the Organization testified that they consulted materials distributed by the Commonwealth of Virginia as a guide for planning the post-prom celebrations.  (Barbone Dep. p. 78-79 ln. 22-8.)  The fact that a state entity in another state has, however, published and distributed materials on how to plan such post-prom celebrations is not sufficient to establish that this activity has been traditionally exclusively reserved for the Commonwealth of Pennsylvania.  The undisputed evidence is that the Organization sought to put together post-prom celebrations as an alternative to individual student celebrations, making it clear that hosting a party after a prom is not traditionally reserved to the state.  Therefore, the court finds that there is no genuine issue of material fact that there was no state action under the "exclusive province of the state" test.  The organization of a post-prom celebration is not such activity.

2.    State Compulsion

The second test for establishing state action focuses on whether "the private party has

acted with the help of or in concert with state officials." <u>Mark</u>, 51 F.3d at 1142 (quoting

<u>McKeesport Hosp. v. Accreditation Council for Graduate Medical Educ.</u>, 24 F.3d 519, 524 (3d

Cir. 1994)).  The Supreme Court has noted the importance of the distinction between the state's

exercise of coercive power or provision of significant encouragement (overt or covert) and the

"mere approval or acquiescence in the initiatives of a third party." <u>Blum</u>, 457 U.S. at 1004

(1982).

 In this case, Plaintiff argues that defendant Prager

> was the authority in charge of the Post Prom Celebration.  He had
> the final say on every detail of the event.  He was regularly met
> [sic] with the voluntary committee to discuss various issues
> concerning the Celebration and he gave ultimate approval to every
> aspect of their plans.  Moreover he was the individual who was in
> charge of all routine matters during the event itself.

(Pl.'s Memo. Supp. Resp. in Opp. to Defs.' Mot. Summ. J. p. 9.)

 Upon review of the record, the court finds this case is an example, not of state action, but

of the state's "approval or acquiescence in the initiatives of a third party."  The initiative for the

formation of the Organization, with the stated purpose of organizing a drug and alcohol-free

post-prom celebration came from the parents and other community members, not the defendants

or any state agency or representatives thereof.  Prager did meet with Organization members on

multiple occasions to approve plans regarding the Party.  Prager was <u>not responsible</u> for

organizing the Party nor did he delegate the task of organizing the Party as being activities

permissible on high school property.  Rather, he approved plans which were presented to him by

those who took the initiative to organize the Party.  The District did not require students to attend

the Party as a condition of attending the prom.  The interaction between the District and the

Organization is focused, in part, by the Organization's desire to use the high school as a venue. In this respect, the cooperation of the District and its officials was <u>essential</u> to the execution of a post-prom celebration as originally envisioned by the Organization.  Despite this, and that the District may have provided some support to the Organization in planning, organizing and running the Party, the school or state involvement does not rise to the level of state "exercise of coercive power or provision of significant encouragement."  As a matter of law, the court finds that there is no genuine issue of material fact as to whether there was state action under the "state compulsion" test.

3. *Joint Participation*

The final test for establishing state action requires that "the state has so insinuated itself with the private actor that it must be recognized as a joint participant in the offending actions." <u>Graham</u>, 2002 WL 1608230 at *5 (citing <u>Burton v. Wilmington Parking Authority</u>, 365 U.S. 715 (1961)).

In <u>Burton v. Wilmington Parking Authority</u>, 365 U.S. 715 (1961), the United States Supreme Court found that there was state action when a privately run restaurant, located inside a building owned and operated by the Parking Authority, a state agency, refused to serve a customer because he was African-American.  The Parking Authority was responsible for maintenance of the building, which was paid from public funds, and rental revenue received from the restaurant made it possible for the Agency to maintain the public parking structure.  <u>Id.</u> at 724.  The Court found that the location of the restaurant inside a parking facility "confers on each an incidental variety of mutual benefits."  <u>Id.</u>  In holding that the state was a "joint participant" in

15

the unconstitutional discrimination, the Court reasoned that

> all these activities, obligations and responsibilities of the
> Authority, the benefits mutually conferred, together with the
> obvious fact that the restaurant is operated as an integral part of a
> public building devoted to a public parking service, indicates that
> degree of state participation and involvement in discriminatory
> action which it was the design of the Fourteenth Amendment to
> condemn.

Id.  "Neither can it be ignored, especially in view of [the restaurant's] affirmative allegation that

for it to serve Negroes would injure its business, that profits earned by discrimination not only

contribute to, but also are indispensable elements in, the financial success of a governmental

agency."  Id.

The Supreme Court contrasted the facts of Burton with those presented in Moose Lodge

No. 107 v. Irvis, 407 U.S. 163 (1972), and concluded that there was no state action when a

private club discriminated on the basis of race, despite the fact that the club held a liquor license

issued by the state.  The Court found that the relationship between the state and the private club

did not reach the level of a symbiotic relationship between the state and the restaurant in Burton.

Id. at 175.  The Court emphasized that Burton involved a public restaurant in a public building,

whereas Moose Lodge involved a private club in a private building.  Id.  Despite the detail of the

state liquor license regulations, the Court stated that they did not "make the state in any realistic

sense a partner or even a joint venturer in the club's enterprise."  Id. at 177.  The Court held that

"the operation of the regulatory scheme enforced by the Pennsylvania Liquor Control Board does

not sufficiently implicate the State in the discriminatory guest policies of Moose Lodge to make

the latter 'state action' within the ambit of the Equal Protection Clause of the Fourteenth

Amendment."  Id. at 177.

16

In the present case, while there was some relationship between the District and the Organization, it does not rise to the level of a symbiotic relationship such that the actions of the Organization can be fairly attributed to the state.  See Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982).  Here, the District received minimal, if any, benefit from its involvement with the Organization and the resulting post-prom celebrations.  The Organization clearly benefitted from its relationship with the District in that it was permitted to use the high school as a venue and it received assistance supervising the event by volunteer district and school administrators.  Use of the school as a venue came with several conditions, including the applicability of the school rules to the Party.  This condition, however also applied to other groups who used District property to hold meetings after school hours.  Such does not transform the working relationship between the District and the Organization into the type of symbiotic relationship that constitutes "joint participation."  Similarly, the recognition of the "senior school official" as being in charge of routine matters relating to discipline by the Organization during the Party is an extension of the application of the school rules.  There is evidence that the District and its administrators provided support to the Organization in planning and holding the Party, as well as previous post-prom celebrations.  Despite Defendants' provision of such support for the event, the court concludes that the state did not "so insinuate itself with the private actor" such that it can be considered a joint participant in the actions alleged to have led to Plaintiff's injuries.

Having concluded that there is no question of material fact that would lead a reasonable jury to find that there was state action, the court finds that Plaintiff cannot meet the initial threshold of a claim under § 1983.  Defendant's motion for summary judgment is granted.

17

C.      **State-Created Harm**

Even assuming, *arguendo*, that the court were to find that there is a genuine issue of

material fact as to whether the threshold requirement of state action could be met, Plaintiff

cannot establish liability under 42 U.S.C. § 1983 on a theory of state-created danger.

Generally, the state does not have a duty to protect an individual from harm caused by a

third party.  See DeShaney v. Winnebago Co. Dep't of Soc. Serv., 489 U.S. 189, 196 (1989); see

also Roberson v. City of Philadelphia, No. Civ. A. 99-3574, 2001 WL 210294, *7 (E.D. Pa.

March 1, 2001).  The Third Circuit has recognized an exception to this rule when there is a state-

created danger.  See, e.g., Kneipp, 95 F.3d at 1199.

In the Third Circuit, a plaintiff must prove four elements to establish a claim for state-

created danger under § 1983:

> (1)     the harm ultimately caused was foreseeable and fairly
>         direct;
> (2)     a state actor acted with a degree of culpability that shocks
>         the conscience;
> (3)     a relationship between the state and the plaintiff existed
>         such that the plaintiff was a foreseeable victim of the
>         defendant's acts, or a member of a discrete class of persons
>         subjected to the potential harm brought about by the state's
>         actions, as opposed to a member of the public in general;
>         and
> (4)     a state actor affirmatively used his or her authority in a way
>         that created a danger to the citizen or that rendered the
>         citizen more vulnerable to danger than had the state not
>         acted at all.

Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006)(internal citations and

quotations omitted), cert denied, 127 S.Ct. 1483 (2007).  The court will examine each element in

turn.

### 1.    *Foreseeable and fairly direct*

The first element requires a determination of whether the harm ultimately caused was foreseeable and fairly direct.  "[A] harm is foreseeable when a state actor has actual awareness, based on concrete information, of a risk of harm to an individual or class of individuals such that the actor is on notice that his or her act or failure to act significantly enhances that risk of harm." Gremo v. Karlin, 363 F.Supp.2d 771, 784 (E.D. Pa. 2005).

The Third Circuit, in Kneipp v. Tedder, 95 F.3d 1199 (3d Cir. 1996), adopted the "state-created danger" theory as a means of establishing a constitutional violation under 42 U.S.C. § 1983.  In Kneipp, police officers stopped a husband and wife as they walked home.  Id. at 1201. The wife was visibly highly intoxicated and the husband indicated to the officers that he wanted to get her home.  Id.  The officers permitted the husband to go home to relieve the babysitter.  Id. at 1202.  The husband believed that the officers would bring his wife home or take her to the hospital or police station.  Id.  After the husband left, the officers left the wife alone on the side of the road, providing no assistance in getting her home, despite evidence that she was so intoxicated that she had difficulty walking.  Id. at 1201-02.  The wife did not make it home and was found the next day unconscious at the bottom of an embankment near the couple's home.  Id. at 1203.  She suffered severe brain damage as a result of her overnight exposure to the cold.  Id. The court found that the wife's injuries were foreseeable and a fairly direct result of being separated from her husband in cold weather while extremely intoxicated.  Id. at 1208.

The Third Circuit did not find foreseeability of injury in Morse v. Lower Merion School District, 132 F.3d 902 (3d Cir. 1997), when an instructor in a day care located in a public school was killed by a mentally ill woman who entered the school through a back door that had been left

unlocked for the convenience of construction workers.  The individual who killed the teacher had

been seen "loitering in the school and the school area" in the week prior to the murder.  Id.  The

plaintiff did not allege that the killer, or any other mentally unstable individual, had entered the

school building previously or that defendants had any awareness that a mentally unstable

individual would enter the school building.  Id.  The court held that the defendants could not

have "foreseen that allowing construction workers to use an unlocked back entrance for access to

the school building would result in the murderous act of a mentally unstable third party."  Id. at

908.  The Court further found that claim did not satisfy the "fairly direct" requirement as "[t]he

causation, if any, is too attenuated."  Id. at 909.

　　　　After review of the record in this case, the court finds as a matter of law that it was not

foreseeable to Defendants that a Party attendee could still be considered a Party attendee while

operating a motor vehicle two hours after the Party ended, having driven a total of 19.3 miles,

making at least three stops and having a sit-down breakfast at IHOP.  The trips to IHOP,

Audubon, Pennsylvania and Lord's home are acts disassociated from the Party that were not

foreseeable to Defendants.[2]  Hudome did not go directly home and sleep as he had been told to

by the Organization.  He chose to forgo sleep for over two hours after the Party was over.  When

he left the high school, he was only eight minutes driving distance from home.  Each separate,

disassociated act gave Hudome an opportunity to decide not to try to drive further.  Party

attendees were instructed by Party volunteers and supervisors to go home and sleep.  Presumably

this would have also been the requirement of his parent who gave permission for him to stay the

---

　　　　[2]See Gregory v. City of Rogers, 974 F.2d 1006 (8th Cir. 1992), cert denied, 507 U.S. 913
(1993) (finding that police were not liable for the plaintiff's injury because they resulted from a
third party's unforeseeable act of leaving car keys with intoxicated friends upon his arrest).

night at the school under the rules of the Organization.  Hudome's actions were in disregard of the directions of those in charge of the Party.  An accident caused by Hudome falling asleep at the wheel was not foreseeable to the defendants in light of the instruction given to attendees to go home and sleep and the circuitous journey he undertook after the Party ended.  While the defendants may have had actual awareness that Party attendees such as Hudome would stay up all night, despite the availability of a place to sleep, and then drive a vehicle, defendants lacked any actual awareness that Hudome was unable to drive to his home within a reasonable period of time.  Indeed, the record shows that he could have driven safely home within eight minutes or even an hour.

These are not circumstances in which a Party attendee presented as visibly fatigued as he left the Party, and caused an accident by falling asleep at the wheel immediately after pulling out of the high school Parking lot or at any other point on a <u>direct</u> route between the high school and his home.  The time which elapsed and the distance Hudome traveled, two hours and 19.3 miles, compared with the shorter distance between the high school and Hudome's home, 3.24 miles and eight minutes, are facts material to a determination of foreseeability on this record.

Further, the court finds that the accident was not a "fairly direct" result of Defendants' accused actions, which were to host an all-night post-prom celebration and to fail to prohibit attendees from driving themselves home.  The facts demonstrate that the causal link between the hosting of an all-night party and a car accident two hours after the party is tenuous, due, at least in part, to Hudome's separate acts after leaving the high school.  Hudome had the opportunity to leave the Party early if he desired, and he could have taken advantage of the multiple places to rest.  The court concludes as a matter of law, that the "fairly direct" requirement cannot be met

by these facts.

2.      *Shocks the conscience*

In evaluating the second prong of the state-created danger test, the Court must determine whether the defendants' actions shocked the conscience.  Bright, 443 F.3d at 281.  The "exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case."  Kaucher v. County of Bucks, 455 F.3d 418, 426 (3d Cir. 2006) (quoting Miller v. City of Philadelphia, 174 F.3d 368, 375 (3d Cir. 1999)).  One of the circumstances that bears on what conduct will reach this standard is the time frame in which the defendants operated.  Kaucher, 455 F.3d at 426. "Where a defendant has 'the luxury of proceeding in a deliberate fashion . . . deliberate indifference may be sufficient to shock the conscience."  Id. (quotations and citations omitted)(emphasis added).  This degree of culpability is contrasted with a higher fault standard "when a government official is acting instantaneously and making pressured decisions without the ability to fully consider their risks.  In such instances, liability will be applied when a 'purpose to cause harm' is demonstrated."  Miller, 174 F.3d at 375 (internal citations omitted).

Here, the court recognizes that the defendants and the Organization had the "luxury of proceeding in a deliberate fashion" in organizing the Party.  Plans for the 2003 event began nearly one year prior.  Thus, this court believes that deliberate indifference is the appropriate standard to use in determining whether the defendants' conduct shocks the conscience under the state-created danger theory of liability under § 1983.  The Third Circuit has not yet determined the exact level of culpability necessary to reach "deliberate indifference", specifically, whether

actual knowledge is required.  See Sanford v. Stiles, 456 F.3d 298, 310 n.13 (3d Cir. 2006).[3]  The

court, however,  has noted that while it has not yet determined whether actual knowledge is

required for liability in state-created danger claims, "generally, a municipality may be held liable

for a constitutional violation arising from a policy or custom if it demonstrates indifference to a

known or *obvious* consequence."  Id. (emphasis in original)(internal citation omitted).  The Third

Circuit has given guidance to the district courts by noting "the possibility that deliberate

indifference might exist without actual knowledge of a risk of harm when the risk is so obvious

that it should be known."  Id. at 309.  Based on an analysis of the existing Third Circuit case law,

this court concludes that the test to apply to analyze the "shocks the conscience" standard is

whether defendants consciously disregarded a known or obvious danger.

Examination of the record reveals that a concern for student safety motivated the creation

of the Organization itself, as well as the planning of post-prom celebrations such as that which

took place in 2003.  Attendance at the Party was voluntary and required parental permission, and

the organizers provided the option of leaving early to an attendee so long as parental permission

could be obtained.  The ultimate decision-maker as to how long an attendee stayed at the Party

was the attendee's parent, not any member of the Organization or any of the defendants.  There

was no testimony of complaints in previous years with regard to any issue of safety during the

---

[3] Some circuit courts utilize an objective test to determine whether there is deliberate indifference.  See, e.g., Board v. Farnham, 394 F.3d 469, 478 (7th Cir. 2005)("[W]e have articulated the test for deliberate indifference for Fourteenth Amendment purposes to be 'a conscious disregard of known or obvious dangers.'")(internal citations omitted).  Other circuit courts apply a subjective standard.  See, e.g., McQueen v. Beecher Cmty. Sch., 433 F.3d 460, 469 (6th Cir. 2006) (equating deliberate indifference with subjective recklessness, which means "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference")(citation omitted).

post-prom celebration, including students being released in a condition too fatigued to drive

themselves home.  There is no evidence of complaints that the sleeping room provided was too

small or uncomfortable.  While the defendants did not provide any transportation to or from the

Party, defendants did nothing to preclude an attendee from arranging to have a parent or another

third party pick him or her up.  There was no condition that an attendee had to drive him or

herself from the Party in order to attend it.  In addition, Prager testified that part of the

Organization's planning efforts concentrated on providing breakfast to the attendees before

leaving the Party and checking to make sure they were "alert."  (Prager Dep. p. 37 ln. 8-11.)

While Prager testified to having some knowledge as to the dangers of drowsy driving, he

had never read anything on the subject.  (Prager Dep. p. 47 ln. 5-8.)  Evans had some previous

knowledge about drowsy driving, primarily from television news clips.  (Evans Dep. p. 12 ln. 5-

6.)

Whether it would have been a good idea for the organizers and supervisors of the Party to

provide alternative transportation, or even forbid attendees from driving themselves home, is not

the question before the court in determining whether this prong has been met.  This court "must

evaluate defendants' decisions at the time they were made."  Kaucher, 455 F.3d at 428 (citing

Deshaney, 489 U.S. at 202).  The court finds, as a matter of law, that at the time the defendants'

decisions were made, they could not be characterized as ones that "shocked the conscience."

Despite knowledge that attendees could be awake all night, the court finds that no

reasonable juror could conclude that Defendants consciously disregarded a known danger.

Defendants did not know that Hudome was so fatigued that he would fall asleep at the wheel two

hours after being discharged from the party, nor did they have any actual knowledge that he

24

would not go straight home and go to sleep as directed, but that he would stay out driving and socializing for an additional two hours.

Further, the court finds that no reasonable juror could find that the defendants consciously disregarded an obvious risk of harm. Defendants had not received complaints in prior years about attendees' condition following any post-prom celebration, had no knowledge that Hudome was too fatigued to drive when he left the Party, which is not evidenced by the record based on Hudome's testimony that he felt "fine" and continued to stay awake for two hours following dismissal from the Party. Knowledge that attendees had been awake all night is not sufficient to meet this standard nor is Prager and Evan's knowledge from television news clips about the dangers of drowsy driving. Plaintiff cannot prove at trial that Defendants' actions "shock the conscience" because, under the facts of this case, they were not conducted with deliberate indifference.

### 3.    *Relationship between state and Plaintiff/discrete class of persons*

The third prong of the state-created danger test requires an examination of whether there was a relationship between the state and Plaintiff such that she was a foreseeable victim of Defendants' acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions. See Bright, 443 F.3d at 281. Plaintiff argues that any motorist traveling in the vicinity of Methacton High School in the hours after the Party ended was a foreseeable victim of a crash caused by a sleep-deprived attendee and that she belongs to the class of "lawful users of the highways in the vicinity of Methacton High School." (Pl's Mem. Law in Opp. to Defs.' Mot. Summ. J. p. 17.) Defendants disagree and characterize Plaintiff as a

mere "member of the general public."

The Third Circuit has explained that liability is limited to individuals or a discrete class because

> [w]here the state actor has allegedly created a danger toward the public generally, rather than an individual or group of individuals, holding a state actor liable for the injuries of foreseeable plaintiffs would expand the scope of the state-created danger theory beyond its useful and intended limits.  Where ... the allegedly unlawful acts of the state actor affect only a limited group of potential plaintiffs, the potentially broad reach of the state-created danger theory is constrained by examining whether the plaintiff or plaintiffs were "foreseeable" victims.

Morse, 132 F.3d at 913 n. 12.

In Solum v. Yerusalim, No. 98-4056, 1999 WL 395720 (E.D. Pa. June 17, 1999), aff'd, 211 F.3d 1262 (3d Cir. 2000), the court rejected the plaintiffs' contention that they belonged to the discrete class of drivers on Route 1.  Since the plaintiffs were parents of the decedent, the court found that the alleged class at issue would be travelers along Route 1 and their parents, since there would be no reason to limit the class to drivers or exclude passengers.  The court held that the purported class was descriptive of the general population and not a discrete class.  Id. at *5.  In so holding, the court explained that "Route 1 is a major traffic artery traveled by thousands daily, and this class contains an unquantifiable and virtually unidentifiable mass of potential plaintiffs."  Id.

The proposed class in this case suffers from the same problems of breadth as the class that was rejected in Solum.  The class proposed by Plaintiff would encompass all travelers within the "vicinity" of Methacton High School after the Party ended.  Based on the uncontested facts, such a class would need to include drivers within a 19.3 mile radius of the high school during a

period of time no less than two hours following the end of the Party.

 To accept Plaintiff as a member of the purported class would be to extend the state-created danger doctrine beyond "its useful and intended limits."  No reasonable juror could find that there is a genuine issue of material fact as to this element of the state-created danger test.

    *4. Affirmative use of state authority*

 The final element of a state-created harm is that the defendants <u>affirmatively</u> used their authority in a way that created a danger to Plaintiff or that rendered Plaintiff more vulnerable to danger.  <u>See</u> <u>Bright</u>, 443 F.3d at 281.  Defendant argues that the plaintiff cannot meet this prong because the facts do not demonstrate that Defendants committed any affirmative acts.

 Liability "requires affirmative state action; mere failure to protect an individual against private violence" is not sufficient to violate the Due Process Clause of the 14th Amendment. <u>Bright</u>, 443 F.3d at 282 (internal citations omitted).  The Third Circuit has explained that "the dispositive factor appears to be whether the state has in some way placed the plaintiff in a dangerous position that was foreseeable, and not whether the act was more appropriately characterized as an affirmative act or an omission." <u>Morse</u>, 132 F.3d at 915.

 Here, it is clear that the Organization, and *arguendo*, Defendants, organized and held an event which lasted all night for attendees with parental permission.  The plans for this event included provisions for students who did not wish to stay all night or to stay awake all night. There was no action by the Organization or Defendants that required any Party attendee to stay awake all night or that required an attendee such as Hudome to drive himself home in any condition, fatigued or not.  Hudome was free to leave the Party and was never compelled to be

there or to stay there, but could come or go as his parents permitted.  When he left the Party at

6:15 a.m., he was free.  See, e.g., Ye v. U.S., No. 06-1034, 2007 WL 1241830 at *7 (3d Cir.

April 30, 2007)(emphasizing that misrepresentation of defendant physician was not a "'restraint

of personal liberty' that is 'similar' to incarceration or institutionalization.").  Plaintiff's

argument that the defendants did not provide alternative transportation, such as a bus, is

suggestion of an omission by Defendants, rather than an affirmative action.  Likewise, Plaintiff's

argument that defendants did not evaluate each Party attendee individually, as he or she departed,

is a alleged omission rather than an allegation of an affirmative action on defendants' parts.

Finally, as attendees checked out and left the Party, volunteers reminded them to go home and

sleep.  This instruction standing alone distinguishes this case from the facts in Kneipp.  There,

the officers stopped the couple on their way home, allowed husband to proceed home but left the

wife alone on the side of the road to make her own way home, knowing that she was helpless and

hapless as a result of heavy intoxication and without assistance or instruction for her safety.

By holding a Party that lasted all night, a reasonable juror could find that the defendants

did render Plaintiff more vulnerable to the danger of being in a vehicular accident caused by

driver fatigue.  However, since Hudome did not go straight home from the Party, as attendees

directed, but instead engaged in several separate disassociated acts over a period of two hours, no

reasonable juror could find that Defendants' actions were a foreseeable cause of the plaintiff's

injuries.

Having considered the facts, viewed in a light most favorable to Plaintiff, the Court finds

that no reasonable jury could conclude that Plaintiff met the four prongs of the state-created

danger test.  As a result, Plaintiff's claim for liability under 42 U.S.C. § 1983 on a theory of state-

created danger fails, and the court must grant Defendants' motion for summary judgment on this count.

### D.    Policy and Custom Claims

Plaintiff alleges that the Defendants implemented a policy of holding overnight post-prom celebrations beginning in 2000 and also adopted a policy or had a custom which resulted in a failure to properly organize, conduct or supervise the Party by, specifically, 1) failing to initiate policies or procedures regarding attendee's health and safety; 2) adopting a custom or practice of relying on inadequately trained volunteers to supervise Party attendees; 3) adopting a policy or practice of allowing sleep-impaired or deprived Party attendees to operate motor vehicles after the Party without first determining if they were fit to drive; 4) failing to initiate policies to train Party supervisors to recognize sleep deprivation in attendees; and 5) adopting a custom of failing to train agents or employees regarding the health and safety of attendees, including sleep deprivation.  (Pl.'s Amend. Compl. ¶¶ 9, 21.)

A local government may be liable under § 1983 when the execution of its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  Monell v. Dep't of Soc. Servs. of the City of New York, 436 U.S. 658, 694 (1978).  There is no liability under § 1983 on a theory of *respondeat superior*.  Id.  To establish liability under a Monell theory of governmental policy or custom, a plaintiff must "identify the challenged policy, attribute it to the city itself, and show a causal link between the execution of the policy and the injury suffered."  Losch v. Borough of Parkesburg, 736 F.2d 902, 910 (3d Cir. 1984) (citing Bennett v. City of Slidell, 728 F.2d 762, 767 (5th Cir.

1984)).

The court finds that Plaintiff's Monell allegations cannot survive the motion for summary judgment for several reasons.  First, since the court has found that there was no state action, it follows that Plaintiff cannot establish that a policy, practice or custom of the state caused her to suffer a constitutional injury.  Second, even assuming *arguendo*, that there is a genuine issue of material fact as to whether there was state action, the court's finding above, that Plaintiff cannot establish liability under § 1983 under a theory of state-created danger, precludes a Monell claim.  At least one court in the Third Circuit has interpreted liability under § 1983 on a theory of governmental policy, practice or custom as requiring an underlying constitutional violation.  In Giovinco v. Foster, No. Civ.A. 3:CV-03-1569, 2003 WL 23573864, at * 4 (M.D. Pa. Dec. 15, 2003), the court explained that a "policy, practice or custom is only unconstitutional because it allows *another* unconstitutional violation."  Id.  (emphasis in original)(citations omitted).  The court held that since Plaintiff did not make allegations which would establish a state-created danger, there could be no liability for any policy, practice or custom."

Finally, the court finds that Plaintiff cannot establish Monell liability because she cannot demonstrate the existence of any policy, practice or custom of Defendants, which, enacted or conducted with deliberate indifference, caused Plaintiff's alleged constitutional injury.  See Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir. 1989), cert denied, 489 U.S. 1062 (1990).

"Policy" is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy or edict." Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting, in part, Pembauer

v. City of Cincinnati, 475 U.S. 469 (1986)).  "Custom" includes the practices of state officials

that, while not authorized by law, are "so permanent and well-settled as to virtually constitute

law."  Andrews, 895 F.2d at 1480 (internal quotations and citations omitted).  While

acquiescence by an official with final authority as a decisionmaker is sufficient to establish

governmental custom, the Third Circuit has noted that "the responsible decisionmaker [need not]

be specifically identified by the plaintiff's evidence.  Bielevicz v. Dubinon, 915 F.2d 845, 850

(3d Cir. 1990) (citing Andrews, 895 F.2d at 1480)).  Having established the existence of a policy

or custom, a plaintiff must meet two additional prongs to establish liability.  First, the plaintiff

must demonstrate that the defendants' policy or custom caused the alleged constitutional injury.

Black by Black v. Indiana Area School Dist., 985 F.2d 707, 712 (3d Cir. 1993).  Second, there

must be proof that the defendants acted with "deliberate indifference" to the risk of injury.  Id.

Negligent failure to recognize the risk of injury is not sufficient to meet the "deliberate

indifference" requirement.  Colburn v. Upper Darby Township, 946 F.2d 1017, 1025 (3d Cir.

1991).

There is no dispute that Superintendent Evans is a policymaker, the parties dispute

whether Prager is a "decisionmaker possessing final authority to establish municipal policy."

The court finds that while there is an issue of fact as to this designation, it is not a material fact.

Plaintiff cannot establish that Evans, Prager or any other known or unknown alleged District

policymaker issued an official proclamation, policy or edict with respect to any element of the

2003 Party or post-prom celebrations generally.  The only District policy about which there is

evidence is a "Safety Policy" that was in effect at the time of the 2003 Party.  (Defs.' Mot.

Summ. J. Ex. N.)  Plaintiff's allegations focus on the organization of post-prom celebrations, the

planning of such celebrations, the hosting of such a celebration, the encouragement of minor attendees to stay awake all night, the utilization of volunteers, the lack of training of these volunteers and the allowance of the same minor attendees to drive themselves home after the party.  These are allegations of a practice or custom rather than an official policy.  See, e.g., Monell, 436 U.S. at 661 n. 2 (undisputed that the defendant had a citywide policy of "forcing women to take maternity leave after the fifth month of pregnancy unless a city physician and the head of an employee's agency allowed up to an additional two months of work").

As the record fails to illustrate the existence of an official proclamation, policy or edict concerning defendant District's role in organizing and/or hosting the 2003 Party or prior post-prom celebrations in 2000, 2001 and 2002, analysis of the defendants' dispositive motion will center on whether a custom or practice of Defendants, carried out with deliberate indifference, caused a constitutional injury to Plaintiff.  The first question to resolve is whether organizing an optional all-night post-prom celebration and permitting attendees to arrange their own transportation, including driving themselves home, for four consecutive years, are practices "so permanent and well settled" as to "have the force of law."  Monell, 436 U.S. at 691.  The Court finds that, as a matter of law, Plaintiff cannot establish the existence of any such a custom.  The planning and hosting of such all-night post-prom celebrations once per year for four consecutive years, for which attendance was voluntary and parental permission mandatory, and allowing attendees to drive themselves home, even if "sleep-deprived", is not so permanent and well-settled as to have the force of law.  In so finding, the court again emphasizes the voluntariness of attendance of the party, the duration an attendee stayed, and whether an attendee got any rest during the party, as well as the choice of any attendees driving themselves home after these

32

celebrations to do so.  Hosting a voluntary event and allowing attendees (and their parents or legal guardians) to arrange for their own transportation home cannot be understood to have "the force of law."

Further, the court finds as a matter of law, that Defendants' actions, to the extent that they could be understood to be a custom to which § 1983 liability potentially attaches, were not carried out or conducted with deliberate indifference.  As discussed above, both Prager and Evans' testimony indicates that they had some awareness of the dangers of "drowsy driving." There is no evidence that defendants or members of the Organization received any complaints regarding students being too fatigued to drive themselves home after the conclusion of a post-prom celebration or of any accidents involving celebration attendees after being discharged from the celebration.  There was no knowledge on behalf of any defendant that attendees, in complete disregard of plain instructions, would not go directly home after the Party's end, but would instead make several socializing stops and continue to drive over a period of two hours without sleep.  The benefit of hindsight cannot guide this court's analysis.  Having considered the record before it, the court concludes as a matter of law that defendants' actions and inactions were not undertaken with "deliberate indifference" to the possibility of constitutional injury.

The court next addresses whether there is genuine issue of material fact with respect to Plaintiff's allegations that Defendants failed to train volunteers at the Party to "recognize the signs and symptoms of sleep deprivation in attendees before permitting them to operate motor vehicles is so obvious that the failure to train was a deliberate indifference."[4]  (Pl.'s Mem. Supp.

---

[4] In their Motion for Summary Judgment, Defendants argue that Plaintiff's "failure to train" claims should be treated separately after the court makes a determination as to Plaintiff's policy and custom claims.  In so arguing, Defendants rely on <u>Page v. The School District of</u>

Resp. Opp. Mot. Summ. J. p. 23.)

Despite Plaintiff's allegations that defendants adopted a custom of failing to train volunteers to detect whether attendees were too fatigued to drive, there is no evidence in the record of any "training" that would assist an individual in determining whether an individual is unfit to drive.  To succeed on a claim for inadequate training a plaintiff must "establish that the identified deficiency in the [defendants'] training is closely related to injury suffered by the plaintiff." Page v. The Sch. Dist. of Philadelphia, 45 F. Supp.2d 457, 467 (E.D. Pa. 1999)(internal citations omitted).  Plaintiff does not point to an "identified deficiency so much as to an alleged lack of training altogether on detecting sleep deprivation.

Plaintiff's expert, Thomas Dingus, Ph.D, CHFP, stated that "[a]lthough verbal questions and answers regarding driving fitness would be limited in effectiveness, a visual determination of the students' state of drowsiness . . . could have helped avoid a hazardous situation." (Dingus Report p. 4.)  Hudome testified that he did not feel tired as he left the Party.  More importantly, he testified that he did not believe he displayed any symptoms of fatigue and that if anyone had asked him how he felt, he would have responded "fine."  Testimony from Party organizer Jeanne Worman indicates that volunteers were in fact looking for signs of fatigue among Party attendees as they left.  As such, there is no evidence in the record to support Plaintiff's allegation that the

---

Philadelphia, 45 F. Supp.2d 457 (E.D.Pa. 1999), in which the court stated that "[i]n order to sustain a claim for failure to train ... plaintiffs must be able to support an underlying constitutional violation.  Because this Court has concluded that the defendants did not have a constitutional duty to protect [the plaintiff] from harm from third parties under either a special relationship theory, a state-created danger theory, or a policy, practice or custom theory, the plaintiffs did not have a claim for failure to train as a matter of law."  Id. at 467-68.  In Page, the plaintiff argued the failure to train claim as separate and apart from the policy and custom claims, which is not the case in the instant matter.

type of training or the lack of training with respect to detecting sleep deprivation in Party attendees "is closely related to the injury suffered by the plaintiff."

Further, the court finds that any failure to train was not the product of deliberate indifference. There is no evidence of a <u>conscious disregard</u> of a known or obvious danger with respect to training. Plaintiff's allegations concerning failure to train are vague. Plaintiff's counsel admitted at oral argument that there is no way to test for sleep deprivation, especially not a simple objective test such as a breathalyzer test for blood alcohol content. There was no reasonable alternative training suggested to prepare volunteers to screen attendees as they left the Party.

Having found that there is no identifiable custom within the meaning of <u>Monell</u> to establish governmental liability, and that any practices were not conducted with deliberate indifference, the court finds that Plaintiff's cause of action for failure to train fails as a matter of law.

The court grants Defendants' motion for summary judgment with respect to the allegation that a policy, practice or custom of any of defendants, most notably of the District, related to the organization, planning, or execution of the Party creates liability under § 1983.

### E.     Qualified Immunity

Finally, Defendants move for summary judgment based on the argument that the claims against the individual defendants should be dismissed because they are entitled to qualified immunity. It is the burden of the individual defendants to establish that they are entitled to qualified immunity. <u>Ryan v. Burlington County</u>, 860 F.2d 1199, 1204 n. 9 (3d Cir. 1988), <u>cert</u>

denied, 490 U.S. 1020 (1989).  It is important to resolve questions of immunity "at the earliest possible state in the litigation."  Saucier v. Katz, 533 U.S. 194, 201 (2001) (citing Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)).

Courts must conduct a two step inquiry to determine the merits of a claim of qualified immunity: 1) whether the facts alleged show the officer's conduct violated a constitutional right and 2) whether the constitutional right was clearly established at the time of violation.  Saucier, 533 U.S. at 201.  Further, public officials are entitled to qualified immunity if they acted "reasonably in the good-faith fulfillment of their responsibilities."  Wilson v. Schillinger, 761 F.2d 921, 929 (3d Cir. 1985), cert denied, 475 U.S. 1096 (1986).  "'Clearly established rights' are those with contours sufficiently clear that a reasonable official would understand that what he is doing violates that right.  A plaintiff need not show that the very action in question has previously been held unlawful, but needs to show that in light of the preexisting law the unlawfulness was apparent."  McLaughlin v. Watson, 271 F.3d 566, 571 (3d Cir. 2001) (citing Shea v. Smith, 966 F.2d 127, 130 (3d Cir. 1992)), cert denied, 535 U.S. 989 (2002).

Here, having found that there is no state action and Plaintiff's allegations do not meet the threshold requirement of § 1983, the court does not need to reach the issue of whether the individual defendants have established qualified immunity.  Were the court to reach this question, however, it would conclude, upon consideration of the record, that the individual defendants have established qualified immunity since they acted reasonably in the good-faith fulfillment of their responsibilities as school district officials to provide a safe physical premises for the post-prom Party.

**IV.    CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted consistent with the final order of April 4, 2007.